## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

ALPS PROPERTY & CASUALTY
INSURANCE COMPANY,

     Plaintiff,

v.                                                     No. 1:22-cv-00440

PATRICK L. WESTERFIELD, ESQ.;
WESTERFIELD LAW OFFICES, LTD.; and
DAVID TAYLOR,

     Defendants.

### <u>COMPLAINT</u>

Plaintiff ALPS Property & Casualty Insurance Company ("ALPS"), pursuant to 28 U.S.C. §§ 2201(a) and 2202 and Federal Rules of Civil Procedure 8(a) and 57, for its complaint against Defendants Patrick L. Westerfield, Esq. ("Westerfield"), Westerfield Law Offices, Ltd. ("Westerfield Firm" and together with Westerfield, "Westerfield Defendants"), and David Taylor ("Taylor" and together with the Westerfield Defendants, "Defendants") alleges as follows:

### PARTIES, JURISDICTION, AND VENUE

1.     ALPS is an insurance company and corporation organized under the laws of the State of Montana with its principal place of business in the State of Montana; ALPS is a citizen of the State of Montana.

2.     Westerfield is an attorney licensed in the State of New Mexico and, upon information and belief, domiciled in and a citizen of the State of New Mexico.

3.     The Westerfield Firm is a professional corporation organized under the laws of the State of New Mexico with its principal place of business in Los Ranchos, New Mexico.

Westerfield is, upon information and belief, the president and sole director of the Westerfield Firm.  The Westerfield Firm is a citizen of the State of New Mexico.

4.     Taylor is, upon information and belief, a resident of Dona Ana County, New Mexico, domiciled in the State of New Mexico, and a citizen of the State of New Mexico.

5.     The Court has jurisdiction over this case pursuant to 28 U.S.C. § 1332(a)(1) because complete diversity exists between ALPS and Defendants, and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

6.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims for relief occurred in this district.

## GENERAL ALLEGATIONS

7.     In this insurance coverage action, ALPS seeks a judgment declaring Lawyers Professional Liability Insurance Policy No. ALPS13738-12 issued by ALPS to the Westerfield Firm for the policy period April 21, 2021 to April 21, 2022 ("Policy") does not afford coverage to the Westerfield Defendants with respect to the claim ("Claim") by Taylor against the Westerfield Defendants, as articulated in the suit styled *Taylor v. Patrick L. Westerfield, Individually, and as Trustee of the Ivan Scott Taylor and Virginia Ann Newberry Taylor Revocable Living Trust*, No. D-202-CV-2021-06027 (Second Jud. Dist. Ct. Bernalillo Cty., N.M.) ("Suit").  A true and correct copy of the Policy is attached as **Exhibit A**.

### I. Background

### A.  Westerfield's Services as Trustee of the Taylor Trust

8.     The Claim arises from Westerfield's services as Trustee of the Ivan Scott Taylor and Virginia Ann Newberry Taylor Revocable Living Trust ("Taylor Trust").  (April 26, 2022 Amended Complaint in the Suit ("Amended Complaint") ¶ 1.  A true and correct copy of the

Amended Complaint is attached as **Exhibit B**.).

### 1. Taylor Trust

9.      Taylor alleges his parents, Ivan Scott Taylor ("Ivan") and Virginia Ann Newberry Taylor ("Virginia" and together with Ivan, "Grantors"), as grantors and initial co-trustees, established the Taylor Trust on March 29, 1976.  (**Exhibit B ¶ 4**).

10.      Taylor alleges the Grantors amended and restated the Taylor Trust multiple times between 1988 and 1997, before Ivan died in 2008, and Virginia subsequently executed amendments to the Taylor Trust on November 11, 2009, December 18, 2012, and November 12, 2018.  (**Exhibit B ¶ 4**).

11.      Taylor alleges Virginia "became incapacitated" in late 2018 and Westerfield "became the successor trustee of the [Taylor] Trust at that time under the terms of the Fourth Amendment", which Virginia executed on November 12, 2018.  (**Exhibit B ¶ 4**).

12.      On June 15, 2019, Taylor alleges Virginia died.  (**Exhibit B ¶ 4**).

13.      Taylor alleges "the Third Amendment to the [Taylor] Trust Agreement directs the Trustee to continue to administer the [Taylor] Trust assets for the benefit of" Taylor. (**Exhibit B ¶ 5**).  Taylor further alleges the "[a]ssets held in the [Taylor] Trust include real property in California and New Mexico, as well as cash in unknown amounts and unknown accounts."  (*Id.*).

### 2. Administration of the Taylor Trust after Virginia's Death

14.      Taylor alleges, "[s]ince the death of [Virginia] on June 15, 2019, [Westerfield] has not communicated with [Taylor] regarding the [Taylor] Trust and the administration of its assets, despite numerous requests by [Taylor], both verbally and in writing."  (**Exhibit B ¶ 6**).

15.     In March 2021, Taylor alleges he "retained legal counsel" and, by correspondence dated March 5, 2021 ("March 5, 2021 Correspondence"), Taylor's counsel "requested a complete Trustee's Report, as set forth in Section 46A-8-813 NMSA", from Westerfield. (**Exhibit B** ¶ 6; March 5, 2021 Correspondence. A true and correct copy of the March 5, 2021 Correspondence is attached as **Exhibit C**.).

16.     In response to the March 5, 2021 Correspondence, Taylor alleges Westerfield "provided various documents" to Taylor "regarding the [Taylor] Trust assets, . . . a summary of receipts and disbursements for the [Taylor] Trust for 2019 and 2020 as well as some other ancillary documents, which were sent after [Taylor] had to retain legal counsel to compel delivery of Trust information and documentation." (**Exhibit B** ¶ 6).

17.     Taylor alleges the following concerns and discrepancies with respect to expenses, disbursements, and other administration of the Taylor Trust by Westerfield:

a.      Failure to provide "supporting documentation" for "$55,773.90 of expenses" for the Taylor Trust in 2019, including "accounting and bookkeeping charges of $16,000 that were likely paid directly to" Westerfield. (**Exhibit B** ¶ 7).

b.      In the "2019 summary of receipts and disbursements for the [Taylor] Trust, it states that the following amounts were placed in 'Retainer': $25,896.64, $277,551.45, and $427,847.92, for a total place[d] in retainer of $731,296.01." (**Exhibit B** ¶ 8). Taylor alleges Westerfield "never provided any documentation to [Taylor] to substantiate or explain why this enormous amount of money was placed in retainer or provided proof that this amount was, in fact, deposited into [the Westerfield Firm's] trust account." (*Id*.).

c.      "At no point in time has [Westerfield] provided [Taylor] with copies of any attorney invoices or billing memos for" the following attorneys' fees billed to the Taylor Trust: $414,900.00 in 2019; $355,050.00 in 2020; and $410,400.00 in 2021. (**Exhibit B** ¶ 9). Taylor alleges Westerfield billed the Taylor Trust a total amount of $1,180,350.00 in attorneys' fees and $140,000.00 in paralegal fees throughout the 2019-2021 time period, Westerfield "intentionally concealed from [Taylor] the payment of the $1,180,350.00 of attorney's fees", and "these attorney's fees are plainly

exorbitant in relation to the work performed by [Westerfield] in his role as Trustee." (*Id*.).

d.      Taylor alleges Westerfield paid himself "large amounts of money in attorney's fees in connection with a restaurant in Las Cruces, Guacamole's, Inc." ("Guacamole's") and services allegedly provided to Janis Newman, Virginia's daughter and Taylor's sister. (**Exhibit B ¶¶** 10, 30). Taylor further alleges, after Ms. Newman died in 2017, Westerfield charged Virginia $6700 for services related to Guacamole's and subsequently "paid himself an additional $200,030 in attorney's fees relating to the Guacamole's matter between April of 2016 and October of 2017." (*Id*.). Taylor alleges Ms. Newman "has no beneficial interest in the [Taylor] Trust" and "[a]ny legal services provided by [Westerfield] in connection with Guacamole's did not benefit the [Taylor] Trust and its beneficiaries." (*Id*.).

e.      Taylor alleges the Taylor Trust "owned certain farmland in California that was leased to a Mr. Bob Hull and semi-annual rent payments were made in the amount of $55,773.00." (**Exhibit B ¶** 11). Taylor further alleges, "for 2019 and 2020, there should have been a total of $167,319.00 of rental income to the" Taylor Trust, but "[t]he documentation provided by [Westerfield] only discloses a single rental payment of $55,773.90 for 2019" and Westerfield "failed to account for the other three (3) rental payments from Mr. Bob Hull under the lease agreement." (*Id*.).

f.      Taylor alleges the "fair market value" of 600 acres of farmland in Blythe, California ("Blythe Property"), which was owned by the Taylor Trust and sold by Westerfield in October 2020 for $4 million, "was significantly higher than the sale price at the time of sale, as determined by an appraised price per acre value." (**Exhibit B ¶** 12).

g.      Taylor alleges, in September 2021, "without the knowledge or consent" of Taylor or his counsel, Westerfield "entered into a further agreement related to the" Blythe Property, "which has caused [Taylor] to lose additional principal" and "income" and "significantly increased [Taylor]'s tax liability." (**Exhibit B ¶** 13). Taylor further alleges Westerfield "retained a company called the Nash Group and paid that company $90,000" in connection with the sale of the Blythe Property, but Westerfield "has not provided [Taylor] with any documentation regarding services the Nash Group may have provided, if any." (*Id*. ¶ 14).

18.     Taylor alleges the Taylor Trust, "[b]ased upon recent documentation. . . currently has approximately $175,000 of cash." (**Exhibit B ¶** 15).

19.     Taylor further alleges, by correspondence dated March 17, 2021, Westerfield "resigned as trustee of the [Taylor] Trust" and, "[a]s such, [Westerfield] has had no authority to act on behalf of the [Taylor] Trust since March 17, 2021."  (**Exhibit B** ¶ 16).

## B.  The Claim

### 1.  Pre-Suit Demands

20.     By correspondence to Westerfield dated March 5, 2021, Taylor's counsel advised he had "been retained by [Taylor] in connection with [Taylor's] beneficial interest in the" Taylor Trust.  (**Exhibit C** at 1).

21.     In the March 5, 2021 Correspondence, Taylor's counsel stated "we have numerous questions regarding the administrations of both the" Estate of Virginia Newberry Taylor ("Estate") and the Taylor Trust.  (**Exhibit C** at 1).

22.     In the March 5, 2021 Correspondence, Taylor requested information and documents relating to the Taylor Trust and the Estate, including "an inventory of the Estate", "a Trustee's Report for the [Taylor] Trust, pursuant to Section 46A-8-813(B) NMSA 2003", "any and all documents and correspondence involving" the Blythe Property, "2019 federal and state income tax returns for Taylor Investment Properties, LLC", and the "contents of the safety deposit box at Wells Fargo Bank for Virginia[.]"  (**Exhibit C** at 1-2).

23.     By correspondence from Taylor's counsel to Westerfield's personal counsel dated April 9, 2021 ("April 9, 2021 Correspondence"), Taylor reiterated his requests in the March 5, 2021 Correspondence for an inventory of the Estate and a Trustee's Report for the Taylor Trust.  A true and correct copy of the April 9, 2021 Correspondence is attached as **Exhibit D**.

24.    In the April 9, 2021 Correspondence, Taylor emphasized "the letters and enclosures [Westerfield] [has] sent us" in response to the March 5, 2021 Correspondence "fall far short of what we originally requested" and threatened to take legal action to compel production of the materials requested. (**Exhibit D** at 1-2).

25.    On or around April 30, 2021, upon information and belief, on Westerfield's behalf, Westerfield's personal counsel, Philip A. Klawuhn, provided certain documents related to the Estate and the Taylor Trust to Taylor's counsel.

26.    By correspondence from Taylor's counsel to Westerfield dated May 7, 2021 ("May 7, 2021 Correspondence"), Taylor reiterated his requests for an inventory of the Estate and a Trustee's Report for the Taylor Trust "in the proper format, along with supporting documentation." (May 7, 2021 Correspondence at 1. A true and correct copy of the May 7, 2021 Correspondence is attached as **Exhibit E**.).

27.    In the May 7, 2021 Correspondence, Taylor requested, *inter alia*, "bank account statements" for various accounts with the Bank of Albuquerque and Wells Fargo Advisors, copies of rental checks and other documents related to the Blythe Property, and "documentation regarding" the "environmental problems and issues" concerning the Blythe Property. (**Exhibit E** at 1-2).

28.    In the May 7, 2021 Correspondence, Taylor alleged "approximately $1,300,000 is unaccounted for relating to the [Taylor] Trust." (**Exhibit E** at 2).

### 2. The Suit

29.    On October 18, 2021, Taylor filed his complaint ("October 2021 Complaint") in the Suit against Westerfield, individually and as Trustee of the Taylor Trust. (October 2021

Complaint.  A true and correct copy of the October 2021 Complaint, without exhibits, is attached as **Exhibit F**.).

30.     In the October 2021 Complaint, Taylor alleged causes of action for statutory breaches of fiduciary duty, "attorney negligence", breaches of common law fiduciary duties, embezzlement, conversion, fraud, and fraudulent concealment arising from Westerfield's administration of the Taylor Trust.  (**Exhibit F**).

31.     On April 26, 2022, Taylor filed the Amended Complaint in the Suit against Westerfield, individually and as Trustee of the Taylor Trust.  (**Exhibit B**).

32.     In the Amended Complaint, as in the October 2021 Complaint, Taylor alleges causes of action for statutory breaches of fiduciary duty, "attorney negligence", breaches of common law fiduciary duties, embezzlement, conversion, fraud, and fraudulent concealment arising from Westerfield's administration of the Taylor Trust.  (**Exhibit B**).

33.     In Count I of the Amended Complaint, Taylor alleges statutory breaches of the fiduciary duties imposed on "New Mexico trustees" by the New Mexico Uniform Trust Code. (**Exhibit B ¶** 17).  Taylor alleges Westerfield "breached nearly all of" the "twelve distinct statutory duties" the New Mexico Uniform Trust Code "imposes . . . on New Mexico trustees", *id*., as follows:

   a.     <u>Breach of § 46A-8-801</u>

   Taylor alleges Westerfield "breached the § 801 duty" to "administer the trust in good faith, in accordance with its terms and purposes and the interests of the beneficiaries and in accordance with the Uniform Trust Code" because Westerfield: (i) "provided nearly no information on the transactions he undertook as Trustee for several years, despite several requests for information from" Taylor; (ii) "when [Westerfield] did finally provide information on the administration of the [Taylor] Trust following demand from [Taylor]'s attorney, the information [Westerfield] provided showed numerous self-dealing transactions"; (iii) Westerfield's "Summary of Receipts" for the Taylor Trust "shows a clear pattern of . . . acting in the best interests of himself", and not "in

the best interest of the beneficiaries"; and (iv) Westerfield sold Taylor Trust "assets", including the Blythe Property, "for below fair market value." (**Exhibit B** ¶¶ 17-20).

b.     Breach of § 46A-8-802

Taylor alleges Westerfield breached the duty imposed by 2003 NMSA § 46A-8-802, which "requires a trustee 'to administer the trust solely in the interests of the beneficiaries'", because: Westerfield paid "himself [] nearly 1.4 million dollars ($1,400,000) as attorney's fees, both in connection with the Blythe farm sale and Guacamole's restaurant"; Westerfield "paid to or for his benefit exorbitant expenses for travel and accounting work"; and, through "[t]hese clear self-dealing transactions[,] . . . put his own interests above the interest of the beneficiary." (**Exhibit B** ¶ 22).

c.     Breach of § 46A-8-804

Taylor alleges Westerfield breached the duty imposed by 2003 NMSA § 46A-8-804, which requires a trustee to "administer the trust as a prudent person would" and to "exercise reasonable care, skill and caution", because: Westerfield "sold real property held by the [Taylor] Trust for less than fair market value"; Westerfield "paid approximately $1,400,000 in attorney, paralegal, and consulting fees . . . to carry out a transaction worth $4,000,000", *i.e.*, the sale of the Blythe Property; Westerfield "imprudently invest[ed] [Taylor] Trust assets" by closing the Taylor Trust's "Wells Fargo brokerage accounts", which held $1,105,399.30 in funds and "generated substantial investment income" while invested with Wells Fargo, distributing $200,000 to Taylor and $200,000 to himself, and transferring the remainder of funds withdrawn—$731,296.01—to the Westerfield Firm's trust account as a "Retainer", where the Taylor Trust "assets no longer generated any income" and "have not earned any income or generated any investment-related growth whatsoever since 2019[.]"  (**Exhibit B** ¶¶ 23-27).

d.     Breach of § 46A-8-805

Taylor alleges Westerfield breached the duty imposed by 2003 NMSA § 46A-8-805, which provides "the trustee may incur only costs that are reasonable in relation to the trust property, the purposes of the trust and the skills of the trustee", because Westerfield "incurred $1.6 million dollars ($1,600,000) in attorney, paralegal and consulting fees" and "[t]hese fees are plainly excessive in relation to the value of trust property."  (**Exhibit B** ¶ 28).

e.     Breach of § 46A-8-806

Taylor alleges Westerfield breached the duty imposed by 2003 NMSA § 46A-8-806, which provides "[a] trustee who has special skills or expertise 'shall use those special skills or expertise'", because Westerfield "paid himself nearly

$1,400,000 in totally unjustified attorney's fees."  (**Exhibit B** ¶ 29).  Taylor further alleges there is "no legal basis to support" the payment of $200,300 to Westerfield for legal services provided in connection with Guacamole's, a restaurant owned and operated by Ms. Newman, Taylor's sister; "[i]n addition to the $200,300 in 'Guacamole's' fees, [Westerfield] also paid himself an additional $1,180,350.00 in attorney's fees from 2019 through 2021"; and "[t]hese fees are manifestly and outrageously excessive, even from a layman's perspective, and are even more so from the perspective of an experienced attorney."  (*Id*. ¶¶ 30-32).

f.    Breach of § 46A-8-809

Taylor alleges Westerfield breached the duty imposed by 2003 NMSA § 46A-8-809, which requires a trustee to "take reasonable steps to take control of and protect the trust property", because: "a significant percentage of [Taylor] Trust assets, including over $700,000 in 'retainer', is still not properly accounted for with source documentation"; Westerfield "distributed $1,180,350.00 to himself, which may have been spent" and "belong[s] to the beneficiary of the [Taylor] Trust"; and Westerfield "appears to have transferred a large portion of [Taylor] Trust assets into his lawyer trust account."  (**Exhibit B** ¶ 33).

g.    Breach of § 46A-8-810

Taylor alleges Westerfield breached the duties imposed by 2003 NMSA § 46A-8-810, which requires a trustee to "keep adequate records of the administration of the trust" and "keep trust property separate from the trustee's own property", because: "[d]espite repeated requests from [Taylor] and [Taylor]'s attorney, [Westerfield] has still yet to produce a comprehensive accounting" and Taylor "still does not have a complete picture what assets were held in the [Taylor] Trust at the time that [Westerfield] accepted his authority as Trustee, the value of those assets at that time, what assets left or came into the [Taylor] Trust since that time, the income earned by the [Taylor] Trust during that time, or a current value of the [Taylor] Trust assets"; "[i]nstead, [Westerfield] has provided details of the various items of income and expenses for the [Taylor] Trust in his own form of internal accounting", which is "not enough for compliance with the Trust Code"; Westerfield "seems either unable or unwilling to provide . . . source documentation" for his "internal accounting"; and Taylor "is left to simply to 'trust' that [Westerfield's] internal accounting figures are in fact true and accurate."  (**Exhibit B** ¶ 34).  Taylor further alleges Westerfield's "comingling of [Taylor] Trust assets with his personal assets" also "implicates § 810."  (*Id*.).

h.    Breach of § 46A-8-811

Taylor alleges Westerfield breached the duties imposed by 2003 NMSA § 46A-8-811, which requires a trustee to "take reasonable steps to enforce claims of the trust and defend claims against the trust", because Westerfield: "paid $200,300 to himself as part of a 'claim' for attorney's fees in connection with the

Guacamole's restaurant", even though "Guacamole's restaurant has never been an asset of the [Taylor] Trust and the [Taylor] Trust has no interest in it"; and "used [Taylor] Trust assets to pay a frivolous legal claim." (**Exhibit B** ¶ 35).

i.  <u>Breach of § 46A-8-813</u>

Taylor alleges Westerfield breached the duties imposed by 2003 NMSA § 46A-8-813 because Westerfield has: "wholly failed to keep [Taylor], who is a qualified beneficiary of the [Taylor] Trust, informed about the administration of the [Taylor] [T]rust and of the material facts necessary for him to protect his interests"; and "failed to promptly respond to [Taylor]'s requests for information related to the administration of the [Taylor] Trust." (**Exhibit B** ¶ 36).

34.    In Count II of the Amended Complaint, for "attorney negligence and breach of common law fiduciary duties", Taylor alleges: Westerfield "owes a duty" to Taylor "to act in a reasonable manner for attorneys practicing in [New Mexico]"; Westerfield owed Taylor duties of "loyalty, candor, and competency"; Westerfield was "negligent and violated fiduciary duties by the actions described" in the Amended Complaint; "[a]s a result of such negligence and breaches, [Taylor] has suffered harm such as loss of income, loss of value of the estate, excessive attorney's fees and other damages to be proved at trial"; and Westerfield's "conduct was both willful and wanton and/or in reckless or utter disregard of the rights of [Taylor] and [Taylor] is therefore entitled to punitive damages." (**Exhibit B** ¶¶ 38-42).

35.    In Count III of the Amended Complaint, pursuant to 2003 NMSA § 46A-8-802, Taylor requests the court void the following alleged "self-dealing transactions" listed in the "Summary of Receipts" Westerfield provided in connection with his administration of the Taylor Trust: "Guacamole's Claim for Attorney Fees"; "transfers to 'Retainer'"; "other funds paid to [Westerfield] as 'Attorney Fees'"; and "the payment to Nash Group" in connection with the sale of the Blythe Property.   (**Exhibit B** ¶¶ 44-45).  Taylor alleges "[t]he 'Guacamole's Claim for Attorney Fees,' 'Retainer,' and 'Attorney Fee' Transactions involve the transfer of funds from [Westerfield], in his fiduciary capacity, to himself, in his personal capacity", and are therefore

"voidable under § 802" because they are "facially obvious instances of self-dealing[.]" (*Id*. ¶ 45).

36.     In Count IV of the Amended Complaint, for embezzlement under New Mexico UJI 14-1641, Taylor alleges: "[t]he tort of embezzlement involves the entrustment of assets to the care of defendant, the conversion of those assets entrusted to the defendant to the defendant's own use, and the defendant's intent to fraudulently deprive the rightful owner of the owner's assets"; Westerfield "was entrusted with the care of the assets of the [Taylor] Trust, [Westerfield converted] nearly $1.4 million dollars worth of trust assets to his own use, and it appears that such conversion was done with the intent to fraudulently deprive [Taylor] of access to such assets"; and "[a]ccordingly, [Westerfield] should be held liable for the tort of embezzlement."  (**Exhibit B** ¶ 48).

37.     In Count V of the Amended Complaint, for conversion, Taylor alleges: "[c]onversion is the unlawful exercise of dominion and control over personal property belonging to another in exclusion or defiance of the owner's rights constituting an unauthorized use of another's property or unlawful detention after demand has been made"; Taylor "has made numerous requests for the return of assets wrongfully taken by" Westerfield; and Westerfield's "refusal to comply with [Taylor]'s demand, and in particular [Westerfield's] attempt to characterize [Taylor] Trust assets as his 'attorney fee,' constitutes conversion."  (**Exhibit B** ¶ 50).

38.     In Count VI of the Amended Complaint, for fraud, Taylor alleges Westerfield "committed common law fraud because he misrepresented fact by asserting a claim for attorney's fees in connection with Guacamole's, when in fact no such claim existed,

[Westerfield] was aware of the falsity of the claim, and [Westerfield] intended to induce [Taylor]'s reliance, to [Taylor]'s detriment."  (**Exhibit B** ¶ 52).

39.     In Count VII of the Amended Complaint, for fraudulent concealment, Taylor alleges: "given [Westerfield's] fiduciary capacity," Westerfield "has been the sole person with access to and information on the various assets and transactions of the [Taylor] Trust"; "given [Taylor]'s relative lack of access to such information," Westerfield "has an affirmative duty to adequately inform [Taylor], separate and apart from the statutory duties to inform under the New Mexico Uniform Trust Code"; "[f]or the last three years, [Westerfield] has deliberately withheld important information on the assets and transactions of the [Taylor] Trust"; and Westerfield's "actions constitute fraudulent concealment."  (**Exhibit B** ¶ 55).

40.     In the Amended Complaint, in the "Remedies" section, Taylor seeks: (a) statutory damages under the New Mexico Uniform Trust Code, including, but not limited to, "damages to restore the lost value" of the Taylor Trust caused by Westerfield and "profit made by" Westerfield "arising from the administration of the" Taylor Trust; (b) an order from the court, pursuant to 2007 NMSA § 46A-10-1001, reducing or denying Westerfield's compensation, compelling Westerfield to perform his trustee duties, compelling Westerfield to "redress a breach of trust by paying money, restoring property or other means", and compelling Westerfield to provide an accounting; (c) "actual damages incurred as a result of [Westerfield's] embezzlement, conversion, fraud and fraudulent concealment"; (d) punitive damages "for conduct that is malicious, willful, reckless, wanton, fraudulent, or in bad faith"; and (e) "reasonable attorney's fees and costs incurred in" the Suit.  (**Exhibit B** ¶¶ 56-63).

41.     In Taylor's Prayer for Relief in the Amended Complaint, Taylor seeks a judgment in Taylor's favor determining: (a) Westerfield "was negligent in his actions and/or breached his

fiduciary duties to" Taylor; (b) Westerfield "breached his fiduciary duties as owed under the New Mexico Uniform Trust Code"; and (c) Westerfield is liable for embezzlement, conversion, fraudulent concealment, and fraud. (**Exhibit B**, Prayer for Relief). Taylor further seeks: (a) an order voiding "all self-dealing transactions entered into by [Westerfield] and any other transactions voidable under 2003 NMSA § 46A-8-802"; (b) "statutory damages available under 2007 NMSA § 46A-10-1002 . . . , plus interest at the applicable prejudgment rate"; (c) "such relief as may be appropriate under 2007 NMSA § 46A-10-1001"; (d) "actual damages resulting from [Westerfield's] embezzlement, conversion, fraud and fraudulent concealment, plus interest at the applicable prejudgment rate"; (e) "reasonable attorney's fees incurred in" the Suit; (f) punitive damages; and (g) "such other and further relief, whether at law or in equity, general or special, to which [Taylor] may be entitled." (*Id.*).

42.     On May 10, 2022, Westerfield filed an answer and affirmative defenses ("May 2022 Answer") to the Amended Complaint in the Suit. A true and correct copy of the May 2022 Answer is attached as **Exhibit G**.

## II.  The Policy

### A.  2021 Application

43.     On April 3, 2021, Westerfield executed an application ("2021 Application") on behalf of the Westerfield Firm for the Policy.

44.     In the 2021 Application, Westerfield answered "No" to the question: "After inquiring with all members of the Firm, is any attorney or employee in the Firm aware of or have knowledge of any fact, circumstance, act, error, or omission that could reasonably be expected to be the basis of a claim against any current or former attorney in the Firm or its predecessors, regardless of the merit of such claim?"

45.     The 2021 Application provides:

Failure to report any claim made against the applicant Firm or any attorney in the applicant Firm under any current or previous insurance policy, or failure to timely disclose facts, events or circumstances which may give rise to a claim against any current or prior insured, may result in the absence of insurance coverage for any such claim, facts, events, or circumstances which should have been reported, and may result in the cancellation or rescission of any policy ALPS may issue in reliance upon this application.

## B.  The Policy

46.     ALPS issued the Policy to the Westerfield Firm for the policy period April 21, 2021 to April 21, 2022.  (**Exhibit A**, Declarations Items 1 and 4).  The Policy provides limits of liability of $500,000 each claim and $1,000,000 in aggregate.  (*Id.*, Declarations Item 5).

47.     Westerfield is listed as the sole individual attorney insured under the Policy. (**Exhibit A**, Declarations Item 3).

48.     The Policy provides legal professional liability insurance on a claims made and reported basis.  (**Exhibit A**, Insuring Agreements § 1.A).

49.     The Policy's insuring agreement states, in relevant part:

A.      COVERAGE

Subject to the Limit of Liability, exclusions, conditions and other terms of this Policy, the Company agrees to pay on behalf of the Insured all sums (in excess of the Deductible amount) that the Insured becomes legally obligated to pay as Damages, arising from or in connection with A CLAIM FIRST MADE AGAINST THE INSURED AND FIRST REPORTED IN WRITING TO THE COMPANY DURING THE POLICY PERIOD, provided that all of the following conditions are satisfied:

1.      The Claim arises from a Wrongful Act that occurred on or after the Retroactive Coverage Date set forth in Item 2 of the Declarations;

2.      At the Effective Date of this Policy, no Insured knew or reasonably should have known or foreseen that the Wrongful Act might be the basis of a Claim;

15

3.      Notice of the Claim or the Wrongful Act was not given nor required to be given to any other insurer prior to the Effective Date; and

4.      The Claim is not otherwise covered under any other insurance policy that the Company has issued to the Named Insured.

B.      DEFENSE AND CLAIM EXPENSES

1.      For any Claim seeking the recovery of Damages from the Insured and otherwise covered under this Policy, the Company shall have the right and the duty to defend such Claim even if any or all of the allegations of the Claim are groundless, false or fraudulent[.]  . . .

2.      The Company shall pay Claim Expenses in accordance with the terms of this Policy.  The Company shall not have a duty to defend or to pay such expenses as to any Claim not covered under this Policy, and shall have the right to seek reimbursement from any Insured, who shall promptly provide such reimbursement, for any amount paid by the Company in defending any such non-covered Claim, including any amount paid in defending a non-covered Claim that is asserted together with one or more covered Claims.

(**Exhibit A**, Insuring Agreements §§ 1.A-1.B) (emphasis in original).

50.      "Claim" is defined in the Policy as "a demand for money or services including, but not necessarily limited to, the service of suit or institution of arbitration or alternative dispute resolution proceedings against the Insured."  (**Exhibit A**, Definitions § 2.C).

51.      "Claim Expenses" is defined in the Policy, in relevant part, as "[f]ees charged by any attorney(s) designated" by ALPS "to defend a Claim or otherwise represent an Insured;" and "[a]ll other fees, costs, and expenses resulting from the investigation, adjustment, defense, and appeal of a Claim (including a suit or proceeding arising in connection therewith), if incurred by" ALPS.  (**Exhibit A**, Definitions §§ D.1-D.2).

52.     "Wrongful Act" is defined in the Policy as "an actual or alleged: (1) [a]ct, error, or omission by the Insured in the performance of Professional Services; and (2) [a] Personal Injury resulting from the Professional Services of the Insured."  (**Exhibit A**, Definitions § 2.DD).

53.     "Damages" is defined in the Policy as any "[m]onetary award by way of judgment or final arbitration, or any settlement"; the Policy specifically excludes from the definition of "Damages":

3.      Punitive, multiple, or exemplary damages, fines, sanctions, penalties or citations, including, without limitation, any consequential or incidental damages, attorney's fees or costs, or pre-judgment or post-judgment interest resulting therefrom, regardless against whom the same are levied or imposed and regardless of whether the same were levied or imposed in a separate matter or proceeding;

4.      Awards deemed uninsurable by law;

5.      Injunctive, declaratory, or other equitable relief, or costs or fees incident thereto;

6.      Restitution, reduction, disgorgement or set-off of any fees, costs, consideration or expenses paid to, awarded to, charged by, or received by an Insured, or any other funds or property of any person or entity presently or formerly held or in any manner directly or indirectly controlled by an Insured;

7.      Judgment, award, verdict, decision or order that includes, as a measure, element or portion of the damages or award set forth therein, any amount the basis of which was determined by reference to the amount of fees, costs, consideration or expenses paid to, awarded to, charged by, or received by an Insured.

8.      Injury or damage to, destruction of, loss of, or loss of use of any funds or property; or

9.      Pollution, contamination, or erosion of any property.

(**Exhibit A**, Definitions § 2.H).

54.     The Policy provides:

6.B.1   When an Insured becomes aware of a Wrongful Act that could reasonably be expected to be the basis of a Claim, but no Claim arising therefrom has yet been made, then as a condition precedent to the Company's obligation to defend or indemnify the Insured under this Policy, the Insured shall immediately give written notice to the Company.  Such notice shall include the fullest information obtainable concerning the potential Claim.

* * *

6.B.4   . . . [I]n the event an Insured fails to give written notice to the Company of a potential Claim, as described in Section 6.B.1, prior to the end of the Policy Period in which the Insured first becomes aware of the Wrongful Act, then no coverage for any such Claim shall be afforded to the Insured under any future policy issued by the Company.

(**Exhibit A**, Conditions §§ 6.B.1 & 6.B.4).

55.     The Policy does not apply to "ANY CLAIM ARISING FROM OR IN CONNECTION WITH . . . [a]ny dishonest, fraudulent, criminal, malicious, or intentionally harmful Wrongful Act committed by, at the direction of, or with the consent of an Insured[.]"

(**Exhibit A**, Exclusions § 3.A) (emphasis in original).

56.     The Policy does not apply to:

ANY     CLAIM     ARISING     FROM     OR     IN     CONNECTION WITH . . . [a]ny Wrongful Act that occurred prior to the Effective Date of this Policy, if . . . [t]here is an earlier-incepting policy of professional liability insurance that provides coverage for the Claim, or would have provided coverage for the Claim if the Insured's obligations under that policy had been complied with, regardless of the amount, if any, of the available limits of liability of the prior policy, and regardless of whether or not the deductible provisions or limits of liability of the prior policy are different from those of this Policy[.]

(**Exhibit A**, Exclusions § 3.E.2) (emphasis in original).

57.     The Policy does not apply to:

ANY     CLAIM     ARISING     FROM     OR     IN     CONNECTION WITH . . . [a]ny Wrongful Act that occurred prior to the Effective Date of this Policy, if . . . [p]rior to the Effective Date of this Policy, any Insured gave or should have given to any insurer, notice of a Claim or potential Claim arising from or in connection with the Wrongful Act, or from any Wrongful Act that is

connected temporally, logically or causally, by any common fact, circumstance, situation, transaction, event, advice or decision to the Claim or potential Claim.

(**Exhibit A**, Exclusions § 3.E.3) (emphasis in original).

58.    The Policy does not apply to "ANY CLAIM ARISING FROM OR IN CONNECTION WITH . . . [a]ny loss, conversion, misappropriation, wrongful disbursement, improper commingling, or negligent supervision by any person of client or trust account funds or property, or funds or property of any other person, held or controlled at any time by an Insured in any capacity or under any authority, including any loss or reduction in value of such funds or property[.]"  (**Exhibit A**, Exclusions § 3.H) (emphasis in original).

59.    The Policy does not apply to "ANY CLAIM ARISING FROM OR IN CONNECTION WITH . . . [a]ny dispute over fees or costs, or any Claim that seeks, whether directly or indirectly, the return, reimbursement or disgorgement of fees, costs, or other funds or property held or controlled at any time by an Insured[.]"  (**Exhibit A**, Exclusions § 3.I) (emphasis in original).

### III.  Notice to ALPS and ALPS's Coverage Position

60.    By correspondence dated October 21, 2021 ("October 21, 2021 Correspondence"), the Westerfield Defendants first provided ALPS with notice of the Claim and a copy of the October 2021 Complaint.

61.    By correspondence dated November 9, 2021, ALPS agreed to provide the Westerfield Defendants with a defense against the Claim, as articulated in the Suit, under the Policy subject to a complete reservation of ALPS's rights to deny coverage and reimbursement of defense costs, and ALPS has provided such defense.

62.    On April 26, 2022, Taylor filed the Amended Complaint in the Suit.  (**Exhibit B**).

63.    By correspondence to the Westerfield Defendants dated May 19, 2022, ALPS provided its supplemental reservation of rights regarding coverage for the Claim under the Policy, as articulated in the Suit.

### FIRST CAUSE OF ACTION

**(For a Declaration the Policy Does Not Afford Coverage to the
Westerfield Defendants for the Claim – Against all Defendants)**

64.    ALPS incorporates and realleges paragraphs 1 through 63 as if fully set forth herein.

65.    The Policy does not afford coverage for the Claim, as articulated in the Suit, to the extent the relief requested does not constitute "Damages" as defined in the Policy. (**Exhibit A**, Insuring Agreements § 1.A & Definitions § 2.H).

66.    The Policy specifically excludes from the definition of "Damages", in relevant part:

3.    Punitive, multiple, or exemplary damages, fines, sanctions, penalties or citations, including, without limitation, any consequential or incidental damages, attorney's fees or costs, or pre-judgment or post-judgment interest resulting therefrom, regardless against whom the same are levied or imposed and regardless of whether the same were levied or imposed in a separate matter or proceeding; . . .

5.    Injunctive, declaratory, or other equitable relief, or costs or fees incident thereto;

6.    Restitution, reduction, disgorgement or set-off of any fees, costs, consideration or expenses paid to, awarded to, charged by, or received by an Insured, or any other funds or property of any person or entity presently or formerly held or in any manner directly or indirectly controlled by an Insured;

7.    Judgment, award, verdict, decision, or order that includes, as a measure, element or portion of the damages or award set forth therein, any amount the basis of which was determined by reference to the amount of fees, costs, consideration or expenses paid to, awarded to, charged by, or received by an Insured; [and]

     8.     Injury or damage to, destruction of, loss of, or loss of use of any funds or property[.]

(**Exhibit A**, Definitions § 2.H).

     67.     In the Amended Complaint, Taylor alleges Westerfield breached fiduciary duties imposed by the New Mexico Uniform Trust Code when he, *inter alia*: (a) paid himself "nearly 1.4 million dollars ($1,400,000) as attorney's fees, both in connection with the Blythe [Property] sale and Guacamole's restaurant"; (b) "paid to or for his benefit exorbitant expenses for travel and accounting work"; and (c) "[i]n addition to the $200,300 in 'Guacamole's' fees" Westerfield paid to himself, for which Taylor alleges there is "no legal basis to support", Westerfield "paid himself an additional $1,180,350.00 in attorney's fees from 2019 through 2021", which Taylor alleges "are manifestly and outrageously excessive[.]"  (**Exhibit B** ¶¶ 22, 30-32).

     68.     In Taylor's cause of action for attorney negligence and breach of common law fiduciary duties, Taylor alleges: "[a]s a result of such negligence and breaches, [Taylor] has suffered harm such as loss of income, loss of value of the estate, excessive attorney's fees and other damages to be proved at trial"; and Westerfield's "conduct was both willful and wanton and/or in reckless or utter disregard of the rights of [Taylor] and [Taylor] is therefore entitled to punitive damages."  (**Exhibit B** ¶¶ 41-42).

     69.     In Count III of the Amended Complaint, Taylor requests the court void the following alleged "self-dealing transactions": "Guacamole's Claim for Attorney Fees"; "transfers to 'Retainer'"; "other funds paid to [Westerfield] as 'Attorney Fees'"; and "the payment to Nash Group" in connection with the sale of the Blythe Property.   (**Exhibit B** ¶¶ 44-45).  Taylor alleges "[t]he 'Guacamole's Claim for Attorney Fees,' 'Retainer,' and 'Attorney Fee' Transactions involve the transfer of funds from [Westerfield], in his fiduciary capacity, to

himself, in his personal capacity", and are therefore "voidable under § 802" because they are "facially obvious instances of self-dealing[.]" (*Id*. ¶ 45).

70.     In Taylor's embezzlement cause of action, Taylor alleges: Westerfield "was entrusted with the care of the assets of the [Taylor] Trust"; Westerfield converted "nearly $1.4 million dollars worth of trust assets to his own use"; and "it appears that such conversion was done with the intent to fraudulently deprive [Taylor] of access to such assets." (**Exhibit B** ¶ 48).

71.     With respect to relief in the Amended Complaint, Taylor seeks, *inter alia*: (a) statutory damages under the New Mexico Uniform Trust Code, including, but not limited to, "damages to restore the lost value" of the Taylor Trust caused by Westerfield and "profit made by" Westerfield "arising from the administration of the" Taylor Trust, plus "interest at the applicable prejudgment rate"; (b) an order from the court, pursuant to 2007 NMSA § 46A-10-1001, reducing or denying Westerfield's compensation, compelling Westerfield to perform his trustee duties, compelling Westerfield to "redress a breach of trust by paying money, restoring property or other means", and compelling Westerfield to provide an accounting; (c) an order voiding "all self-dealing transactions entered into by [Westerfield] and any other transactions voidable under 2003 NMSA § 46A-8-802"; (d) punitive damages "for conduct that is malicious, willful, reckless, wanton, fraudulent, or in bad faith"; (e) "reasonable attorney's fees and costs incurred in the" Suit; and (f) "such other and further relief, whether at law or in equity, general or special, to which [Taylor] may be entitled." (**Exhibit B** ¶¶ 56-63 & Prayer for Relief).

72.     Taylor's demands in the Amended Complaint for restitution, reduction, disgorgement, or set off with respect to any fees, costs, consideration, or expenses paid to or charged by the Westerfield Defendants, or any other funds or property of any person or entity

presently or formerly held or in any manner directly or indirectly controlled by the Westerfield Defendants, are excluded from the definition of "Damages" and outside the coverage afforded by the Policy. (**Exhibit A**, Definitions §§ 2.H.6, 2.H.7).

73.     Taylor's demands "to restore the lost value" of the Taylor Trust and for relief to compensate for the "loss of income" from the Taylor Trust are excluded from the definition of "Damages" and outside the coverage afforded by the Policy because Taylor seeks compensation for injury or damage to, destruction of, loss of, or loss of use of any funds or property. (**Exhibit A**, Definitions § 2.H.8).

74.     Taylor's demands for (a) an order voiding "all self-dealing transactions entered into by [Westerfield] and any other transactions voidable under 2003 NMSA § 46A-8-802", (b) an order compelling Westerfield to perform his trustee duties, (c) an order compelling Westerfield to "redress a breach of trust by paying money, restoring property or other means", and (d) an order compelling Westerfield to provide an accounting are excluded from the definition of "Damages" and outside the coverage afforded by the Policy because Taylor seeks injunctive, declaratory, or other equitable relief, or costs or fees incident thereto. (**Exhibit A**, Definitions § 2.H.5).

75.     Taylor's demand for punitive damages against Westerfield is excluded from the definition of "Damages" and outside the coverage afforded by the Policy. (**Exhibit A**, Definitions § 2.H.3).

76.     Taylor's demands for attorneys' fees and costs incident to the Suit and prejudgment interest are excluded from the definition of "Damages" and outside the coverage afforded by the Policy. (**Exhibit A**, Definitions § 2.H.3).

77.     The Policy does not afford coverage for the Claim, as articulated in the Suit, to the extent any exclusions in the Policy apply to exclude coverage.  (**Exhibit A**, Exclusions § 3).

78.     The Policy excludes coverage for "ANY CLAIM ARISING FROM OR IN CONNECTION WITH . . . [a]ny loss, conversion, misappropriation, wrongful disbursement, improper commingling, or negligent supervision by any person of client or trust account funds or property, or funds or property of any other person, held or controlled at any time by an Insured in any capacity or under any authority, including any loss or reduction in value of such funds or property[.]"  (**Exhibit A**, Exclusions § 3.H) (emphasis in original).

79.     In the Amended Complaint, Taylor alleges causes of action for embezzlement and conversion and further alleges: Westerfield "was entrusted with the care of the assets of the [Taylor] Trust"; Westerfield converted "nearly $1.4 million dollars worth of trust assets to his own use, and it appears that such conversion was done with the intent to fraudulently deprive [Taylor] of access to such assets"; Taylor "has made numerous requests for the return of assets wrongfully taken by" Westerfield; and Westerfield's "refusal to comply with [Taylor]'s demand, and in particular [Westerfield's] attempt to characterize [Taylor] Trust assets as his 'attorney fee,' constitutes conversion."  (**Exhibit B** ¶¶ 48, 50).

80.     In Count III of the Amended Complaint, Taylor alleges "[t]he 'Guacamole's Claim for Attorney Fees,' 'Retainer,' and 'Attorney Fee' Transactions involve the transfer of funds from [Westerfield], in his fiduciary capacity, to himself, in his personal capacity", and are therefore "voidable under § 802" because they are "facially obvious instances of self-dealing[.]" (**Exhibit B** ¶ 45).

81.     Taylor further alleges Westerfield breached fiduciary duties imposed by the New Mexico Uniform Trust Code because: Westerfield "sold real property held by the [Taylor] Trust

24

for less than fair market value"; Westerfield "paid approximately $1,400,000 in attorney, paralegal, and consulting fees . . . to carry out a transaction worth $4,000,000", *i.e.*, the sale of the Blythe Property; Westerfield "paid himself nearly $1,400,000 in totally unjustified attorney's fees"; Westerfield "imprudently invest[ed] [Taylor] Trust assets" by closing the Taylor Trust's "Wells Fargo brokerage accounts", which held $1,105,399.30 in funds and "generated substantial investment income" while invested with Wells Fargo, distributing $200,000 to Taylor and $200,000 to himself, and transferring the remainder of funds withdrawn—$731,296.01—to the Westerfield Firm's trust account as a "Retainer", where the Taylor Trust "assets no longer generated any income" and "have not earned any income or generated any investment-related growth whatsoever since 2019"; Westerfield "paid to or for his benefit exorbitant expenses for travel and accounting work"; Westerfield "incurred $1.6 million dollars ($1,600,000) in attorney, paralegal and consulting fees", which "are plainly excessive in relation to the value of [the Taylor] [T]rust property"; Westerfield "appears to have transferred a large portion of [Taylor] Trust assets into his lawyer trust account"; and Westerfield "used [Taylor] Trust assets to pay a frivolous legal claim." (**Exhibit B** ¶¶ 22, 24-29, 33, 35).

82.    The Claim, as articulated in the Suit, is outside the coverage afforded by the Policy because it arises from or in connection with loss, conversion, misappropriation, wrongful disbursement, improper commingling, or negligent supervision by any person of client funds or property, or funds or property of any other person, held or controlled by an Insured in any capacity or under any authority. (**Exhibit A**, Exclusions § 3.H).

83.    The Policy excludes coverage for "ANY CLAIM ARISING FROM OR IN CONNECTION WITH . . . [a]ny dispute over fees or costs, or any Claim that seeks, whether directly or indirectly, the return, reimbursement or disgorgement of fees, costs, or other funds or

property held or controlled at any time by an Insured[.]"  (**Exhibit A**, Exclusions § 3.I) (emphasis in original).

84.     In the Amended Complaint, Taylor alleges Westerfield breached fiduciary duties imposed by the New Mexico Uniform Trust Code when he, *inter alia*: (a) paid himself "nearly 1.4 million dollars ($1,400,000) as attorney's fees, both in connection with the Blythe [Property] sale and Guacamole's restaurant"; (b) "paid to or for his benefit exorbitant expenses for travel and accounting work"; and (c) "[i]n addition to the $200,300 in 'Guacamole's' fees" Westerfield paid to himself, for which Taylor alleges there is "no legal basis to support", he "paid himself an additional $1,180,350.00 in attorney's fees from 2019 through 2021", which Taylor alleges "are manifestly and outrageously excessive[.]"  (**Exhibit B** ¶¶ 22, 30-32).

85.     In Taylor's cause of action for attorney negligence and breach of common law fiduciary duties, Taylor alleges: "[a]s a result of such negligence and breaches, [Taylor] has suffered harm such as loss of income, loss of value of the estate, excessive attorney's fees and other damages to be proved at trial."  (**Exhibit B** ¶ 41).

86.     In Count III of the Amended Complaint, Taylor requests the court void the following alleged "self-dealing transactions": "Guacamole's Claim for Attorney Fees"; "transfers to 'Retainer'"; "other funds paid to [Westerfield] as 'Attorney Fees'"; and "the payment to Nash Group" in connection with the sale of the Blythe Property.   (**Exhibit B** ¶¶ 44-45).  Taylor alleges "[t]he 'Guacamole's Claim for Attorney Fees,' 'Retainer,' and 'Attorney Fee' Transactions involve the transfer of funds from [Westerfield], in his fiduciary capacity, to himself, in his personal capacity", and are therefore "voidable under § 802" because they are "facially obvious instances of self-dealing[.]"  (*Id*. ¶ 45).

87.     In Taylor's embezzlement cause of action, Taylor alleges: Westerfield "was entrusted with the care of the assets of the [Taylor] Trust"; Westerfield converted "nearly $1.4 million dollars worth of trust assets to his own use"; and "it appears that such conversion was done with the intent to fraudulently deprive [Taylor] of access to such assets." (**Exhibit B** ¶ 48).

88.     With respect to relief in the Amended Complaint, Taylor seeks, *inter alia*: (a) statutory damages under the New Mexico Uniform Trust Code, including, but not limited to, "damages to restore the lost value" of the Taylor Trust caused by Westerfield and "profit made by" Westerfield "arising from the administration of the" Taylor Trust; (b) an order from the court, pursuant to 2007 NMSA § 46A-10-1001, reducing or denying Westerfield's compensation and compelling Westerfield to "redress a breach of trust by paying money, restoring property or other means"; and (c) an order voiding "all self-dealing transactions entered into by [Westerfield] and any other transactions voidable under 2003 NMSA § 46A-8-802[.]" (**Exhibit B** ¶¶ 56-57 & Prayer for Relief).

89.     The Claim, as articulated in the Suit, is outside the coverage afforded by the Policy because it seeks, directly or indirectly, the return or reimbursement of funds or property held or controlled at any time by an insured in any capacity or under any authority.  (**Exhibit A**, Exclusions § 3.I).

90.     The Policy excludes coverage for "ANY CLAIM ARISING FROM OR IN CONNECTION WITH . . . [a]ny dishonest, fraudulent, criminal, malicious, or intentionally harmful Wrongful Act committed by, at the direction of, or with the consent of an Insured[.]" (**Exhibit A**, Exclusions § 3.A).

91.     In the Amended Complaint, Taylor alleges causes of action against Westerfield for embezzlement, conversion, fraud, and fraudulent concealment.  (**Exhibit B ¶¶ 47-55**).  Taylor alleges: Westerfield "was entrusted with the care of the assets of the [Taylor] Trust"; Westerfield converted "nearly $1.4 million dollars worth of trust assets to his own use, and it appears that such conversion was done with the intent to fraudulently deprive [Taylor] of access to such assets"; Taylor "has made numerous requests for the return of assets wrongfully taken by" Westerfield; Westerfield's "refusal to comply with [Taylor]'s demand, and in particular [Westerfield's] attempt to characterize [Taylor] Trust assets as his 'attorney fee,' constitutes conversion"; Westerfield "committed common law fraud because he misrepresented fact by asserting a claim for attorney's fees in connection with Guacamole's, when in fact no such claim existed," Westerfield "was aware of the falsity of the claim, and [Westerfield] intended to induce [Taylor]'s reliance, to [Taylor]'s detriment"; "[f]or the last three years, [Westerfield] has deliberately withheld important information on the assets and transactions of the [Taylor] Trust"; and Westerfield's "actions constitute fraudulent concealment."  (*Id.* ¶¶ 48, 50, 52, 55).

92.     Taylor further alleges Westerfield's "conduct was both willful and wanton and/or in reckless or utter disregard of the rights of" Taylor and Westerfield "willfully breached multiple statutory duties that he owed as a fiduciary."  (**Exhibit B ¶¶ 42, 60**).

93.     In the Amended Complaint, Taylor seeks punitive damages against Westerfield "for conduct that is malicious, willful, reckless, wanton, fraudulent, or in bad faith." (**Exhibit B ¶ 59**).

94.     The Claim, as articulated in the Suit, is outside the coverage afforded by the Policy because it arises from or in connection with dishonest, fraudulent, criminal, malicious, or

intentionally harmful Wrongful Acts committed by, at the direction of, or with the consent of an Insured.  (**Exhibit A**, Exclusions § 3.A).

95.     The Policy potentially provides coverage for claims only if "[a]t the Effective Date of this Policy, no Insured knew or reasonably should have known or foreseen that the Wrongful Act might be the basis of a Claim[.]"  (**Exhibit A**, Insuring Agreements § 1.A.2).

96.     The Policy specifically excludes from coverage any claim arising from or in connection with "[a]ny Wrongful Act that occurred prior to" the Policy's April 21, 2021 effective date if:

> Prior to the Effective Date of this Policy, any Insured gave or should have given to any insurer, notice of a Claim or potential Claim arising from or in connection with the Wrongful Act, or from any Wrongful Act that is connected temporally, logically or causally, by any common fact, circumstance, situation, transaction, event, advice or decision to the Claim or potential Claim.

(**Exhibit A**, Exclusions § 3.E.3).

97.     Under the Policy, "Wrongful Act" is defined as "an actual or alleged: [a]ct, error or omission by the Insured in the performance of Professional Services; and [a] Personal Injury resulting from the Professional Services of the Insured."  (**Exhibit A**, Definitions § 2.DD).

98.     The following occurred prior to the Policy's April 21, 2021 effective date:

a.     By correspondence to Westerfield dated March 5, 2021, Taylor's counsel advised he had "been retained by [Taylor] in connection with [Taylor's] beneficial interest in the" Taylor Trust.  (**Exhibit C** at 1).  In the March 5, 2021 Correspondence, Taylor's counsel stated "we have numerous questions regarding the administrations of both the Estate and the [Taylor] Trust."  (*Id*.).  Taylor requested information and documents relating to the Taylor Trust and the Estate, including "an inventory of the Estate", "a Trustee's Report for the [Taylor] Trust, pursuant to Section 46A-8-813(B) NMSA 2003", "any and all documents and correspondence involving" the Blythe Property, "2019 federal and state income tax returns for Taylor Investment Properties, LLC", and the "contents of the safety deposit box at Wells Fargo Bank for Virginia[.]" (*Id*. at 1-2).

b.      By correspondence from Taylor's counsel to Westerfield dated April 9, 2021, Taylor reiterated his requests in the March 5, 2021 Correspondence for an inventory of the Estate and a Trustee's Report for the Taylor Trust. (**Exhibit D**). In the April 9, 2021 Correspondence, Taylor emphasized "the letters and enclosures [Westerfield] sent us" in response to the March 5, 2021 Correspondence "fall far short of what we originally requested" and threatened to take legal action to compel production of the materials requested. (*Id*. at 1-2).

99.      Moreover, in the Amended Complaint, Taylor variously alleges embezzlement, conversion, fraud, and other self-dealing by Westerfield with respect to assets of the Taylor Trust from approximately 2019 forward. (**Exhibit B**). To the extent these allegations may have merit, by such actions the Westerfield Defendants may have known or reasonably should have known the Westerfield Defendants' acts, errors, or omissions might be the basis of a claim prior to the Policy's April 21, 2021 effective date.

100.     Despite the events and allegations described above, the Westerfield Defendants did not notify ALPS of any actual or potential claim, or any act, error, or omission by them which might be the basis of a claim against any of the Westerfield Defendants prior to the Policy's April 21, 2021 effective date.

101.     The Westerfield Defendants first notified ALPS of circumstances from which the Claim could arise via the October 21, 2021 Correspondence.

102.     The Claim, as articulated in the Suit, is outside the coverage afforded by the Policy because: (a) prior to the April 21, 2021 effective date of the Policy, the Westerfield Defendants knew or reasonably should have known the acts, errors, or omissions alleged in the Claim might be the basis of a claim; (b) prior to the Policy's April 21, 2021 effective date, the Westerfield Defendants should have given ALPS notice of the acts, errors, or omissions that form the basis of the Claim or the potential claims against the Westerfield Defendants arising from the acts, errors, or omissions that form the basis of the Claim; and (c) the Westerfield

Defendants did not notify ALPS of the acts, errors, or omissions that form the basis of the Claim or the potential claims against the Westerfield Defendants arising from the acts, errors, or omissions that form the basis of the Claim until October 21, 2021, after inception of the Policy.

103.   An actual controversy exists between ALPS and Defendants regarding whether the Policy affords coverage for the Claim.

104.   Because the Claim is outside the coverage afforded by the Policy, ALPS is entitled to a declaratory judgment in its favor, pursuant to 28 U.S.C. § 2201, declaring the Policy does not afford coverage for the Claim and ALPS has no duty to defend or indemnify the Westerfield Defendants with respect to the Claim.

## SECOND CAUSE OF ACTION

### (Reimbursement of Defense Expenses – Against the Westerfield Defendants)

105.   ALPS incorporates and realleges paragraphs 1 through 104 as if fully set forth herein.

106.   The Policy states ALPS has no duty to defend or pay Claim Expenses for "any Claim not covered" and has "the right to seek reimbursement from any Insured, who shall promptly provide such reimbursement, for any amount paid by the Company in defending any such non-covered Claim, including any amount paid in defending a non-covered Claim that is asserted together with one or more covered Claims."  (**Exhibit A**, Insuring Agreements § 1.B.2).

107.   The Policy defines "Claim Expenses" to mean, in relevant part, "[f]ees charged by any attorney(s) designated" by ALPS "to defend a Claim or otherwise represent an Insured;" and "[a]ll other fees, costs, and expenses resulting from the investigation, adjustment, defense, and appeal of a Claim (including a suit or proceeding arising in connection therewith), if incurred by" ALPS.  (**Exhibit A**, Definitions §§ D.1-D.2).

31

108.    ALPS is defending the Westerfield Defendants with respect to the Claim under the Policy subject to a complete reservation of rights, including the right to seek recovery from Westerfield, the Westerfield Firm, or any insured under the Policy of all amounts paid in defense of non-covered aspects of the Claim.

109.    For the reasons described above in Paragraphs 64 through 102, the Claim—as articulated in the Suit—is outside the coverage afforded by the Policy.

110.    ALPS is entitled to judgment in its favor and against the Westerfield Defendants for the amount of attorneys' fees and costs paid to defend the Westerfield Defendants with respect to the Claim because the Claim is not covered under the Policy.

WHEREFORE, ALPS prays that judgment be entered in its favor and against Defendants as follows:

1.    Declaring the Policy does not afford coverage to the Westerfield Defendants with respect to the Claim, as articulated in the Suit;

2.    Declaring ALPS has no duty to defend or indemnify the Westerfield Defendants under the Policy with respect to the Claim, as articulated in the Suit;

3.    Awarding damages in favor of ALPS and against the Westerfield Defendants in the amount of the attorneys' fees and costs paid to defend the Westerfield Defendants with respect to the Claim; and

4.    Awarding ALPS such additional relief as shall be deemed appropriate in the circumstances, together with its costs and expenses.

Dated: June 10, 2022

Respectfully submitted,

ATKINSON, BAKER & RODRIGUEZ, P.C.

_/s/ Douglas A. Baker_
Douglas A. Baker
201 Third St. NW, Suite 1850
Albuquerque, NM 87102
(505) 764-8111
dbaker@abrfirm.com

*Attorneys for Plaintiff ALPS Property & Casualty Insurance Company*